| | |
|---|---|
| MORGAN FOODS, INC., | |
| Plaintiff, | |
| v. | Case No. 5:25-CV-00815-LF |
| MID AMERICA FREIGHT LOGISTICS, LLC, | |
| Defendant. | |

**MORGAN FOODS, INC.'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Morgan Foods, Inc. ("Morgan Foods" or "Plaintiff") properly plead its Complaint against Mid America Freight Logistics, LLC ("MAFL" or "Defendant") and, therefore, submits this brief in opposition to Defendant's Motion to Dismiss (the "Motion").

**NATURE OF THE CASE**

Morgan Foods filed its 21-page Complaint, supported by 145 exhibits, detailing the significant losses resulting from MAFL's decisions. Morgan Foods not only placed its trust in MAFL's stated ability to securely transport its shipments and to engage qualified, trustworthy Drivers (as defined below) – it paid MAFL to do so. MAFL failed to meet its obligations, resulting in windfall payments for undelivered products and significant damage to Morgan Foods and its customers. Despite receiving notice of these damages – with 80% involving deliveries shortly before Morgan Foods' July 18, 2024, demand letter (hereinafter the "Demand Letter") – MAFL refused to reimburse Morgan Foods and chose to fight Morgan Foods every step of the way to avoid responsibility.

Even now, in filing this Motion, MAFL attempts to argue that all but one of Morgan Foods' eight counts fail as a matter of law. In doing so, MAFL ignores, or misconstrues, the Complaint's more than one hundred pages of allegations and supporting materials. As explained in detail below, the facts, allegations, and supporting materials, when construed in the light most favorable to Morgan Foods, more than sufficiently allege claims for each of the counts as a matter of federal and North Carolina law.

## STATEMENT OF FACTS

Morgan Foods is a manufacturer of canned and aseptic products serving customers across the United States. (DE #1-1 ¶ 9, Ex. 3.) Morgan Foods hires transportation providers, such as MAFL, to transport and deliver its products. (*Id.* at ¶ 10; DE 19 ¶ 10.) MAFL was selected, in part, because of its advertised shipping expertise and "best-in-class" people and technology "making MAFL the best and the easiest to do business with" and "making every interaction honest, transparent, and easy." (*Id.*) Morgan Foods also relied on MAFL's statements that it would "'never have to worry about' the scenario where 'your load doesn't show up'" because it uses "the industry's best practices," including "through hiring and training the best talent." (DE #1-1 ¶ 11, DE 19 ¶ 11.) As set forth throughout the Complaint, these representations proved untrue.

Morgan Foods hired Transportation Insights, LLC ("TI") to coordinate its selection of brokers and carriers, including MAFL, via their Transportation Management Agreement ("TMA"). (DE #1-1 ¶ 66, Exhibits 143-145.) As part of its services, TI, on behalf of its "CLIENT" Morgan Foods, entered into a series of agreements with MAFL—the Master Transportation Insight - Truckload Broker Agreement ("Truckload Agreement"), the Truckload Fuel Surcharge Agreement ("Surcharge Agreement") and the Truckload Accessorial Agreement ("Accessorial

Agreement") (collectively the Truckload Agreement, Surcharge Agreement, and Accessorial Agreement constitute the "MAFL Agreements"). (DE #1-1, Ex. 1.)

In the Truckload Agreement, MAFL, among other things, agreed to "arrange for motor carriers to receive, transport, and deliver safely without delay CARGO tendered as a result of this agreement" on behalf of Morgan Foods (identified as the "CLIENT"). (Truckload Agreement, § 5; *see* DE #1-1 at ¶¶ 62-63, Ex. 1.) MAFL also assumed liability to Morgan Foods under the Carmack Amendment to the Interstate Commerce Act (49 U.S.C. § 14706) (hereinafter the "Carmack Amendment") for the actual loss of the value of the goods. (Truckload Agreement, § 6.) Furthermore, under the Surcharge Agreement and Accessorial Agreement, MAFL identified itself as a **carrier** – providing a Carrier SCAC (MAFL/MDMH) – which reiterate its responsibility to leverage bills of lading ("BOLs") for all Shipments. (DE #1-1 ¶¶ 64-65 Ex. 1 at 1-3.)

Operating under the MAFL Agreements, MAFL either transported or engaged the final motor carrier/drivers (collectively the "Drivers") who transported the shipments of Morgan Foods' products at issue in this litigation (the "Shipments"). MAFL assumed responsibility under the various agreements for the safe and complete delivery of those Shipments. (*See generally*, DE #1-1, including ¶¶ 12-13, 15.) Unbeknownst to Morgan Foods, running through at least June 2024, MAFL and/or its handpicked Drivers stole hundreds of thousands of cases of Morgan Foods' products – with the theft ramping up exponentially between March and May of 2024.[1] (*See generally,* DE #1-1, including ¶¶ 19, 23, Ex. 3.) Morgan Foods first discovered this scheme in mid-2024 when it initially identified a significant increase in the volume and monetary amount of deductions from product shortages involving MAFL's deliveries. (*Id.* at ¶ 20.)

---

[1] Approximately 114 of the 143 impacted Shipments occurred during this window.

Through its investigation, and prompt cooperation with law enforcement, Morgan Foods learned that it was the victim of an intricate theft scheme by which MAFL's Drivers picked up Shipments from Morgan Foods' warehouse in Jeffersonville, Indiana and during transit removed portions of the Shipments. The Drivers then delivered the now shorted Shipments to Morgan Foods' customer. After the customer provided the Proof of Delivery ("POD") documenting this shortage, the POD was altered to remove any indication of the shortage. (*Id.* at ¶¶ 26-30.) This forged POD was then sent to Morgan Foods making it appear as though the full Shipment had been delivered—allowing for MAFL to be compensated for a full delivery despite significant shortages. (*Id.* at ¶¶ 26-30.) MAFL has never returned this overpayment for undelivered product, nor even offered to do so. Months later, when Morgan Foods received its customer's deductions, it reviewed the altered POD and advised its customer that the PODs reflected a full shipment. It was only after appeals with its customer that Morgan Foods received the unaltered POD documenting the shortage. (*Id.* at ¶¶ 31-34.) Upon comparing the unaltered PODs against the MAFL-provided forged PODs (months after the Shipment) Morgan Foods uncovered the shortages and resulting theft scheme. (*Id.* at ¶ 31.)

The Complaint alleges that MAFL's actions and inactions, including failing to engage in proper due diligence with its Drivers, proximately caused Morgan Foods' damages and entitles Morgan Foods to recovery. (*See generally*, DE #1-1, including ¶¶ 98-102.) Had MAFL exercised any degree of reasonable care then it knew, or should have known, that its Drivers were transitioning from defunct carrier to defunct carrier – alerting it to the scheme. More importantly, MAFL's communications and records reveal that for months MAFL knew at least three carriers it used for Morgan Foods Shipments – who hauled approximately 20% of MAFL's covered loads – were, among other things, "breaking and changing seals;" manipulating and consolidating loads;

4

and removing Over, Short, or Damaged ("OSD") details from BOLs. (DE #1-1 ¶¶ 51-52, Ex. 142.) Despite this knowledge, MAFL inexplicably failed to alert Morgan Foods (and failed to even acknowledge that it had been aware of these issues until December 2024). (*Id.* at ¶¶ 51-52, Ex. 142.) Finally, MAFL failed to exercise any degree of reasonable care when it knew, or should have known, that its Drivers were transitioning from defunct carrier to defunct carrier and being flagged as engaging in unlawful activity, including, but not limited to, stealing products, manipulating shipment documents, and consistently providing unreliable delivery services. (*Id.*)

As described at great length in the Complaint, MAFL's failure to cooperate and thoroughly investigate the theft scheme once notified by Morgan Foods, on top of its preexisting failure to notify Morgan Foods of its Driver's theft activities, caused further damage. MAFL continued to slow-walk information and remained largely absent from the effort to investigate the Shipments— only to summarily deny *all* the claims 92 days after Morgan Foods' initial notice on the basis of a "lack of notice." (*Id.* at ¶¶ 46-50.) The spuriousness of this claim of "lack of notice" is highlighted by the fact that over 80% of the Shipments (for at least $991,534.11 of the estimated loss) involved just one of MAFL's Drivers, Niva Trucking, over a three-month period (March 2024 to June 2024)—less than **one** month before Morgan Foods's Demand Letter. (*Id.* at ¶ 54.)  MAFL was already aware of issues with this Driver prior to the Demand Letter – as it knew a Shipment had been seized by the Federal Bureau of Investigation. (*Id.*; *see also* DE #1-1 Ex. 142.) This refusal to cooperate, investigate, and compensate Morgan Foods not only violated MAFL's obligations under the Carmack Amendment and the Truckload Agreement, but further hindered Morgan Foods' ability to recover and prevent future losses. (*See generally* DE #1-1, including ¶¶ 50, 54-55.)

## ARGUMENT

### I. Defendant's Motion and Memorandum of Law Violate The Court's Procedural Rules.

MAFL's Motion raises several arguments that are not addressed in its Memorandum of Law in Support of Defendant's Motion to Dismiss (the "MOL"). These Motion-only arguments include (a) that the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") preempts punitive damages; (b) that the economic loss rule prevents punitive damages; (c) that MAFL is not a party to the BOLs (it merely states it is not listed or referenced therein); (d) that the covenant of good faith and fair dealing is a "rule of contract interpretation;" and (e) requests a stay without identifying (unspecified) "cases" pending before the Supreme Court involving the scope of FAAAA preemption or articulating a basis for relief. "[I]t is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned." *A Helping Hand, LLC v. Baltimore County, MD*, 515 F.3d 356, 369 (4th Cir. 2008) (citations omitted).

Additionally, Local Rule 7.2(f) limits memoranda to thirty (30) pages (or 8,400 words) in length. In addition to its 26-page, 8,371 word MOL, Defendant's Motion adds an additional 12-pages of alleged facts and legal analysis, including those not in the MOL. Defendant's Motion and MOL should be stricken in whole or in part (i.e., less eight pages) to remedy this violation. *See e.g., Johnson v. Allen*, No. 7:18-CV-14-D, 2019 WL 11316660, at *1 (E.D.N.C. Apr. 25, 2019), aff'd, 784 F. App'x 165 (4th Cir. 2019) (striking memoranda that violated the Local Rules by exceeding the page limits authorized by Local Civil Rule 7.2(f)).

### II. Morgan Foods has Properly Plead and Supported its Claims Under North Carolina and Federal Law.

A "motion to dismiss for failure to state a claim upon which relief may be granted made pursuant to Federal Rule of Civil Procedure 12(b)(6) should not be granted 'unless it appears ***beyond doubt*** that the plaintiff can prove no set of facts in support of his claim which would entitle

6

him to relief.'" *Lambeth v. Carolina Pers. Co.*, 358 F. Supp. 2d 484, 486 (M.D.N.C. 2005) (emphasis added) (internal citation omitted). In a nutshell, a motion to dismiss "test[s] the legal sufficiency of the complaint and not the facts that support," and thus, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Lambeth*, 358 F. Supp. 2d at 486. When considering Defendant's Motion, the Complaint is to be "liberally construed" in the light most favorable to Morgan Foods and all well pled facts are accepted as true. *Id*. Under this standard, the Complaint more than satisfies Morgan Foods' pleading obligations.

### III. Morgan Foods' claims are not preempted by the Federal Aviation Administration Authorization Act.

#### A. Whether MAFL is a Broker or Carrier for Purposes of the FAAAA is a Fact Intensive Analysis That is Premature for a Motion to Dismiss.

Defendant principally argues that all but one of Morgan Foods' claims are preempted under the FAAAA. This argument is premised upon MAFL's assertion that it is a broker, not a carrier. However, courts have repeatedly recognized that the "difference between a broker and a carrier is often 'a blurry one,'" *Auray v. Delivery by Delivery, Inc.*, No. CV 6:23-03155-HMH, 2023 WL 5651868, at *2 (D.S.C. Aug. 31, 2023) (quoting *Essex, Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1300-01 (11th Cir. 2018)), and therefore are rarely ripe for disposition on a Rule 12(b)(6) motion to dismiss because "[a]t this pre-discovery stage in the proceedings, it would be premature for the Court to conclusively resolve [such a] classification because the 'carrier/broker inquiry is inherently fact-intensive and not well suited to summary judgment,' let alone to a motion to dismiss." *Lotte Ins. Co. v. R.E. Smith Enters., Inc.*, 733 F. Supp. 3d 494, 505 (E.D. Va. 2024) (quoting *Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, No. 09 Civ. 2365, 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011)); *see also, Aqua Gulf Logistics, Inc. v. Primetime Glob. Logistics, Inc.*, No. 3:23-CV-547-MMH-JBT, 2023 WL 7187235, at *3 (M.D. Fla. Nov. 1, 2023)

7

(finding that "[d]etermining whether a party is a broker or a motor carrier is an 'inherently fact-intensive' inquiry.") (internal citations omitted); *TRG Holdings, LLC v. Leckner*, No. 1:06CV411, 2006 WL 2076768, at *2 (E.D. Va. July 20, 2006). In *Aqua Gulf Logistics, Inc.*, the court highlighted facts closely mirroring the present case, identifying, among other things: (a) other entities that served as carriers beyond the defendant, (b) bills of lading that identified other carriers, (c) that the defendant did not actually transport the shipments, (d) that the defendant held itself out as a broker to the plaintiff previously, and (e) that communications and documents between the parties showed defendant accepting responsibility for the delivery of a shipment. No. 3:23-CV-547-MMH-JBT, 2023 WL 7187235, at *3-4.

MAFL points to two main arguments as to why it is a broker: it has a registered property broker number with the U.S. Department of Transportation and the Truckload Agreement refers to it as performing "broker" services. (DE #21, pg. 10.) Neither contention is dispositive. *See Saacke N. Am., LLC v. Landstar Carrier Servs., Inc.*, No. 5:11CV107-RLV, 2013 WL 7121197, at *7 (W.D.N.C. Dec. 19, 2013) ("Whether a company is a broker or a carrier / freight forwarder is not determined by how it labels itself, but by how it holds itself out to the world and its relationship to the shipper."); *Phoenix Assur. Co. v. K–Mart Corp.*, 977 F. Supp. 319, 325–26 (D.N.J.1997) (finding that registration as a "broker" and a failure to register as a "carrier" were not dispositive). Despite MAFL's suggestion to the contrary, Morgan Foods has alleged facts that demonstrate MAFL acted as a carrier, not a broker. MAFL's contention that the Truckload Agreement references MAFL as a "broker," and thus it is, ignores not only that it identified itself as the "carrier" in the Surcharge Agreement and Accessorial Agreement but that it also provide its own Standard Carrier Alpha Code ("SCAC"). (DE #1-1, Ex. 1, pgs. 1-3.)

MAFL relies heavily on *Mays v. Uber Freight, LLC*, which it claims to be analogous to the situation here. *Id., No.* 5:23-CV-00073, 2024 WL 332917 (W.D.N.C. Jan. 29, 2024). But *Mays* is

8

readily distinguishable. *Mays* involved far simpler facts and solely tort claims stemming from a motor vehicle accident in which Uber Freight had been hired to arrange the transport of Coca-Cola products. *Id.* at *2. Unlike in *Mays*, where Uber Freight pointed to a single operative agreement that identified it solely as a broker, *id.* at *3, MAFL referred to itself as the "carrier" in the Accessorial Agreement and the Surcharge Agreement – documents MAFL's MOL does not address – and provided its own Carrier SCAC ("MAFL/MDMH") when assuming expectations that flowed to it as a carrier. (DE #1-1 ¶¶ 64-65, 108, Ex. 1, pgs. 1-3.) Also, unlike *Mays*, MAFL was involved in drafting these contracts and clearly had the ability to challenge this designation. *Mays*, No. 5:23-CV-00073, 2024 WL 332917, at *3.

Accordingly, the well pled facts, when viewed in the light most favorable to Morgan Foods reveal at least a genuine question of fact as to MAFL's status—one unsuitable for disposition without discovery.

### B. Even if MAFL is a Broker, the FAAAA Does Not Preempt Morgan Foods' Claims.

Even if MAFL is a broker, the scope of the FAAAA is not nearly as expansive as MAFL contends. Rather, the FAAAA's more narrowly preempts state laws "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The Supreme Court has interpreted the FAAAA to only apply to state laws "having a connection with or reference to carrier 'rates, routes, or services'" but that it is not an unlimited preemption, nor does it include state laws that only have "a tenuous, remote, or peripheral" effect. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013).

MAFL points to *Rowe v. New Hampshire Motor Transport Association* to support its stance that the FAAAA broadly preempts state laws. 552 U.S. 364, 370-371 (2008). However, the court in *Joe Nagy Towing, Inc. v. Lawless* addressed the overly broad interpretation put forward by

9

MAFL. 101 So. 3d 868 (Fla. Dist. Ct. App. 2012). Specifically, the court found that *Rowe* "dealt with state legislation expressly aimed at the trucking industry and having a direct, significant impact on interstate commerce" but nonetheless, *Rowe* "unambiguously observed that general state laws directed at noneconomic, industry-neutral harms are in far less danger of preemption" and that "even state laws having a conceivable impact on carrier prices, routes, or services are not automatically preempted." *Joe Nagy Towing, Inc.*, 101 So. 3d at 876.

Denying MAFL's effort to preempt Morgan Foods' claims also aligns with the legislative history of the FAAAA to "level the playing field between air carriers on the one hand and motor carriers on the other with respect to intrastate economic trucking regulation." *See,* H.R. Conf. Rep. No. 103–677, p. 82 (1994); *see also, City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440 (2002). Courts have found that "the Congressional intent would be far better served by allowing the States to retain their historic police powers" particularly "against those carriers who elect not to follow the rules." *Joe Nagy Towing, Inc*, 101 So. 3d at 876. Furthermore, the FAAAA has been interpreted to not preempt breach of contract claims, or Morgan Foods' other claims, when raised against a broker (which MAFL purports to be). *See, Louis M. Marson Jr., Inc. v. All. Shippers, Inc.*, 438 F. Supp. 3d 326, 335 (E.D. Pa. 2020); *Hartford Fire Ins. Co. v. Dynamic Worldwide Logistics, Inc.*, Civ. A. No. 17-553, 2017 WL 3868702, at *3 (D.N.J. Sept. 5, 2017); *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 287 (5th Cir. 2002); *Joe Nagy Towing, Inc*, 101 So. 3d at 876 (holding that the FAAAA does not preempt conversion claims).

Even with respect to negligent hiring, supervision, and training, in *PCS Wireless LLC v. RXO Capacity Sols., LLC*, which MAFL cites to, recognized that there "is no Fourth Circuit case addressing this issue" with some concluding that that negligent hiring cases "are not preempted because they bear little to no relation to brokers' services." *PCS Wireless LLC v.*

*RXO Capacity Sols., LLC*, No. 3:23-CV-00572-KDB-SCR, 2024 WL 2981188, at fn. 1 (W.D.N.C. June 13, 2024); *see Ortiz v. Ben Strong Trucking, Inc.*, 624 F.Supp.3d 567, 581 (D. Md. 2022); *Taylor v. Sethmar Transportation, Inc.*, No. 2:19-cv-770, 2021 WL 4751419, at * 13-15 (S.D. W. Va. Oct. 12, 2021); *Mann v. C.H. Robinson Worldwide, Inc.*, No. 7:16-cv-102, 2017 WL 3191516, at *7 (W.D. Va. July 27, 2017); *see also, Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1020 (9th Cir. 2020); *Grant v. Lowe's Home Ctr.*, No. 5:20-02278-MGL, 2021 WL 288372, at *3–4 (D.S.C. Jan. 28, 2021) (adopting *Miller*).

### C. Preemption is Also Defeated Under the FAAAA's Safety Exception.

The FAAAA contains a "safety exception" which states that the FAAAA "shall not restrict the safety and regulatory authority of a State with respect to motor vehicles" thereby preserving certain state-law claims against brokers. 49 U.S.C. § 14501(c)(2)(A). MAFL contends that Morgan Foods' claims, on their face, do not involve carrier equipment and do not relate to safety and therefore cannot trigger the "safety exception." Again, the law is neither as broad or settled as MAFL suggests.[2] Courts have held that the safety exception applies when a plaintiff's claims are "related to" broker services by challenging a "core service" of the broker, thus preventing preemption, because "Congress intended to preserve the States' broad power over safety, a power that includes the ability to regulate conduct not only through legislative and administrative enactments, but also through common-law damages awards." *Miller*, 976 F.3d at 1020; *Grant*, No. 5:20-02278-MGL, 2021 WL 288372, at *3–4 (adopting *Miller*). Because this case involves the theft of spoilable and contaminable products – conduct that directly affects public health and safety – the Court should not resolve the safety exception issue before discovery is conducted. Furthermore, the cases MAFL relies upon to support preemption are factually distinct and largely

---

[2] The fact that the question of whether negligent hiring, supervision, and retention is pending before the Supreme Court highlights this point. *Montgomery v. Caribe Transport II, LLC*, No. 24-1238.

limited to motor vehicle accidents that do not involve the intricate theft scheme alleged here, which goes far beyond the FAAAA's limited core purpose.

**IV.    Plaintiff's Claims are Not Precluded by the Economic Loss Rule.**

MAFL's economic loss rule argument reveals a fundamental problem with its position in the case. On one hand, MAFL denies in its Answer that Morgan Foods is an intended third-party beneficiary of the TI contract or that the Truckload Agreement is a valid/enforceable contract. (DE #19 ¶¶ 7, 70-74.)  On the other hand, MAFL argues that Morgan Foods should recover in contract and thus the economic loss rule bars its tort claims. (DE #21, pgs. 14-16.) This is a litigation tactic, not a principled position. Either Morgan Foods is entitled to recover in contract or in tort, but it cannot be completely without remedy after being the victim of the scheme detailed in the Complaint.

North Carolina courts have consistently held that the economic loss rule bars recovery in tort only where a contracting party seeks to recover purely economic losses arising from the subject matter of a contract. *Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 401–02, 499 S.E.2d 772, 780 (1998) (citing *Reece v. Homette Corp.*, 110 N.C. App. 462, 466–67, 429 S.E.2d 768, 770 (1993)); *see also Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992) (holding that a tort action does not lie against a party who "simply fails to properly perform the terms of the contract" when the injury is to the subject matter of the contract). However, the Supreme Court clarified in *Oates v. JAG, Inc.*, 314 N.C. 276, 279–81, 333 S.E.2d 222, 225–26 (1985), that the duty underlying a negligence claim is not a contractual promise itself but an independent duty to exercise reasonable care in performing services which may extend to a plaintiff not in privity of contract. *See also Warfield v. Hicks*, 91 N.C. App. 1, 10, 370 S.E.2d 689, 694 (1988). Consistent with that principle, North Carolina's economic loss rule "does not limit tort actions that arise in the absence of a contract." *Ellis-Don Constr., Inc. v. HKS, Inc.*, 353 F. Supp.

2d 603, 606 (M.D.N.C. 2004). Together, these authorities establish that while the economic loss rule preserves bargained-for allocations of risk, it does not extinguish independent common-law duties of reasonable care owed, even where the damages alleged are economic in nature.

As a preliminary matter, MAFL's arguments are confusing and inconsistent. MAFL denies that Morgan Foods is an intended third-party beneficiary to the contract between itself and TI in its Answer to Morgan Foods' Complaint. (DE #19 ¶ 7.) MAFL attempts to both deny that Morgan Foods is an intended third-party beneficiary to the Truckload Agreement while also asserting that recovery by any means outside of the Truckload Agreement is prevented by the economic loss rule. Furthermore, MAFL's arguments contain a multitude of inconsistencies and confusing assertions. At the close of its section arguing the economic loss rule, MAFL seeks that Counts II, IV, V, VI, VII, and VIII should be dismissed "since all of these state law negligence claims seek to recast an alleged breach of contract claim into a negligence-based tort." (DE #21 p. 16.) However, only Counts IV, VI, and VII are tort-based claims. Count VIII is not a cause of action at all, but a remedy sought by Morgan Foods.

The economic loss rule, by nature, pre-supposes that Morgan Foods is a beneficiary to the Truckload Agreement. MAFL cannot both deny that Morgan Foods is entitled to the remedies under the Truckload Agreement while also denying the availability of any and all remedies outside it. Regardless, Morgan Foods is entitled to proceed as its claims are properly alleged as Morgan Foods argues its claims for breach of contract and breach of the implied covenant of good faith and fair dealing are in the alternative to its tort claims.

Turning to the substance, MAFL's argument for the application of the economic loss rule fails. Defendant's reliance on *Ports Authority v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978), is misplaced. *Ports Authority* did not announce a sweeping rule that the mere existence

13

of a contract somewhere in a commercial relationship bars all related tort claims. Rather, the Supreme Court applied the economic loss rule in the context of a direct contractual relationship between the parties, holding that a contracting party may not recover in tort for purely economic losses arising from damage to the subject matter of the contract itself. The decision was grounded in the principle that parties in privity are free to allocate risk and define remedies through contract, and therefore contract law governs disputes over disappointed commercial expectations.

Subsequent North Carolina authority has clarified that *Ports Authority* is limited to that context. In *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635 (2007), homeowners (the Lords) brought negligence claims against 84 Lumber after roof trusses used in their home were improperly manufactured and installed, resulting in structural defects and economic loss. Importantly, the Lords had no contract with 84 Lumber; the contract for the trusses existed between 84 Lumber and a subcontractor. The defendants argued that the economic loss rule barred the Lords' negligence claims because the damages were purely economic and arose from a contractual transaction. The court rejected that argument, holding that the economic loss rule did not apply where there was no contract between the plaintiff and the defendant. The court emphasized that the rule's purpose is to prevent contracting parties from circumventing negotiated risk allocations, not to immunize from tort liability to non-contracting parties.

In reaching that conclusion, the *Lord* court relied heavily on *Oates v. JAG, Inc.*, 314 N.C. 276 (1985), where the North Carolina Supreme Court held that a negligence claim may proceed even for purely economic losses when the defendant owes the plaintiff a duty independent of contract. The Supreme Court explained that the duty sued upon in negligence is not the contractual promise itself, but the duty to exercise reasonable care in performing services, a duty that exists independent of any contract. *Oates*, 314 N.C. at 279. Applying that reasoning, the *Lord* court

14

recognized that when a plaintiff lacks contractual privity, the economic loss rule does not bar tort claims simply because the loss is economic in nature. *Lord*, 182 N.C. App. at 643.

Together, *Lord* and *Oates* refute Defendant's contention here that the mere existence of a contract somewhere in the transactional chain automatically triggers the economic loss rule. Plaintiff's negligence-based claims are premised on, among other things, Defendant's independent duty to exercise reasonable care in arranging and overseeing transportation services, not merely on a failure to perform contractual promises.

In *McKee v. Lincoln National Life Insurance Co.*, No. CV 0:21-0499-MGL, 2022 WL 2919049 (D.S.C. July 25, 2022), the court addressed whether the economic loss rule barred negligence claims brought by plaintiffs who alleged they were third-party beneficiaries of a life insurance policy. The defendant argued that because the dispute arose from a contract, any recovery was limited to contract remedies. The court emphasized that the "controlling inquiry is not whether the damages are physical or economic, but the source of the duty plaintiff claims the defendant owed." *Id.* at *4.

Here, Defendant owed common-law duties to Morgan Foods to exercise reasonable care in, among other things, selecting, hiring, retaining, supervising, and training the Drivers. (DE #1-1 ¶¶ 96-103.) MAFL further engaged in intentional post-delivery concealment and withholding of Morgan Foods' property which has not been returned. (DE #1-1 ¶¶ 114-120.) Morgan Foods' claims are not solely derived from the contractual relationship between TI and MAFL. Accordingly, Defendant's reliance on the economic loss rule is misplaced and does not warrant dismissal of Plaintiff's claims at the pleading stage.

15

**V.** **The Court should deny Defendant's Motion to Dismiss as Morgan Foods' Complaint is properly pled, and states claims upon which relief can be granted as a matter of law.**

### A. The Complaint States a Claim for Breach of Contract Under Each BOL.

MAFL argues (without a single citation to any case law) that Morgan Foods failed to properly plead a claim for breach of contract pursuant to the BOLs. This claim fails when considered under Rule 12's liberal standard. At this stage, the question is not whether the facts will ultimately prove that each and every BOL was breached or established a contract, but whether Morgan Foods sufficiently alleges such.

MAFL attempts to argue that the Complaint alleges that it is liable to Morgan Foods as a "motor carrier" under the BOLs. (DE #21, pg. 19; DE #20, pg. 6.) However, in reviewing the Complaint, Morgan Foods never once tied the motor carrier status to the BOLs under Count II; rather, it alleges that each BOL was contemplated by the Truckload Agreement, and constitutes a valid, enforceable agreements breached by MAFL and its Drivers. (*See generally* DE #1-1 ¶¶ 81-88.)

Furthermore, MAFL admits in the MOL that the Truckload Agreement expressly provides for the use of the BOLs. (DE #19 pg. 19.) Yet, MAFL failed to articulate how the BOLs affected the obligations between the parties. Instead, as alleged in the Complaint, and reflected in the voluminous exhibits, the BOLs effectuated MAFL's agreement to transport Morgan Foods' products. (DE #1-1 ¶¶ 16-18, Exhibits 4-75, 77-137.) It is clear from the Truckload Agreement that BOLs would be used in its execution and do not alter the underlying contractual relationship. *See* Truckload Agreement, §§ 3, 5-6, 12. Rather, these BOLs served as the basis for the completion of delivery of the Shipments and the mechanism for MAFL to receive payment for the services

16

provided. *Id.*, § 3. MAFL gladly accepted payment pursuant to this course of business, and until now never objected to the BOLs being used.

Recognizing this, MAFL then argues that the BOLs did not constitute contracts because MAFL was not explicitly named on them. However, Courts have held that BOLs alone, or the absence of an entity being named therein, does not end the inquiry and is improper for a motion to dismiss. *Aqua Gulf Logistics, Inc. v. Primetime Glob. Logistics, Inc.*, No. 3:23-CV-547-MMH-JBT, 2023 WL 7187235, at *3-4 (M.D. Fla. Nov. 1, 2023) (holding that "a defendant's omission from a bill of lading" does not defeat liability); *Ever Better Eating, Inc. v. Jama's Express LLC*, No. 8:21-CV-1798-CEH-CPT, 2022 WL 17782391, at *8 (M.D. Fla. Dec. 19, 2022) (finding that just because a party "was not listed as the carrier on the Bill of Lading is not dispositive of its liability"). Much like the BOLs in *Aqua Gulf Logistics, Inc.*, the fact that the BOLs do not directly name MAFL is not dispositive. *Id.*

**B.    *The Complaint States a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.***

The North Carolina Supreme Court has recognized that "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (internal citations omitted). Accordingly, courts have repeatedly recognized that a "claim for a breach of the implied covenant of good faith and fair dealing is separate from a claim of breach of contract." *Nadendla v. WakeMed*, 24 F.4th 299, 308 (4th Cir. 2022); *see also, Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 643 S.E.2d 410, 426 (2007). Under North Carolina law, to state a claim for breach of the implied covenant of good faith and fair dealing, "a plaintiff must plead that the party charged took action 'which injure[d] the right of the other to receive the benefits of the agreement,' thus 'depriv[ing] the other

17

of the fruits of [the] bargain.'" *Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n, Inc.*, 255 N.C. App. 236, 253, 805 S.E.2d 147, 158 (2017) (quoting *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 228-29, 333 S.E.2d 299, 305 (1985)).

Defendant inaccurately argues that the Complaint insufficiently identified any affirmative action taken by MAFL to injure Morgan Foods. (DE #20, pg. 7; DE #21, pgs. 19-20.) Under the liberal pleading standards, these allegations as pled are sufficient; however, this argument is demonstrably counter to Morgan Foods' allegations. Morgan Foods described throughout the Complaint, and incorporated these allegations into Count III, MAFL's failure to perform "reasonable due diligence in selecting and retaining the Drivers." (*See generally* DE #1-1, including ¶¶ 15-19, 23-30, 46-47, 50-55, 89-90.) This included, among others, Morgan Foods' allegations that MAFL (a) failed to provide information, (b) refused to meaningfully assist the investigation, (c) failed to conduct proper due diligence, (d) refused to review or investigate Morgan Foods claim packages, significantly hindering its ability to seek recovery and prevent further ongoing losses, and (e) failed to communicate several, known criminal and negligent actions taken by MAFL's handpicked Drivers. (*Id.*) Each allegations arises independently from MAFL's contractual obligations. Again, the pleading standards do not require every single known fact of the case be pled (nor could it reasonably do so until after discovery is completed) only that it alleges facts sufficient to meet the elements of its claims. *Nadendla*, 24 F. 4th at 308. Morgan Foods has clearly done so.

C.     *The Complaint States a Claim for Negligent Supervision, Hiring, and Retention.*

Beyond its FAAAA preemption and economic loss arguments, already addressed above, Defendant argues that Morgan Foods' claim for negligent supervision, hiring, and retention fails because the Truckload Agreement apportions fault and negligence. (DE #21, pgs. 20-21; DE #20 pgs. 7-8.) MAFL again stretches the language of the Truckload Agreement beyond its actual terms.

Specifically, the Truckload Agreement states that MAFL's liability "shall be reduced *in proportion to the degree of negligence, if any*" of TI or Morgan Foods. Truckload Agreement, § 4. Merely stating that Morgan Foods' negligence claim *may* be reduced by some unstated fault does not warrant dismissal. Even assuming that Morgan Foods was negligent (although it was not), nowhere in this language does it state that any amount of negligence would dissolve all of MAFL's own negligence. Under the liberal pleading rules, Count IV should only be dismissed if MAFL shows "negligence on [the plaintiff's] part proximately contributing to his injury, so clearly that no other conclusion can be reasonably drawn therefrom." *Ramey v. Southern Ry. Co.,* 262 N.C. 230, 234, 136 S.E.2d 638, 641 (1964). Here, MAFL has not even identified what is believes to be Morgan Foods' all-encompassing negligence. The Complaint, taken in the light most favorable to Plaintiff, does not support a conclusion that Morgan Foods was negligent nor that any alleged negligence wholly offset Defendant's own, well-documented negligence.

> **D.** **The Complaint States a Claim, in the alternative, for a Violation of the Carmack Amendment Under 49 U.S.C. § 14706.**

MAFL largely bases its argument of dismissal on the fact that it asserts to be a broker rather than a carrier. As discussed above, such a determination is highly fact intensive and premature. MAFL also ignores that Count V is raised in the alternative to Morgan Foods' other counts and solely in the event that MAFL is determined to be a carrier under the Carmack Amendment. Additionally, Federal Rule of Civil Procedure 8(d)(2)-(3) allows for alternative or even inconsistent claims at "this early stage in the proceedings" and "under the liberal pleading rules" Morgan Foods may pursue theories even if it may not ultimately be able to prevail on every theory. *Myers v. Roush Fenway Racing, LLC*, No. 1:09CV508, 2010 WL 2765378, at *3 (M.D.N.C. July 12, 2010). MAFL also admits that it "assumes secondary liability in the event that a valid claim is not paid" as provided by the Carmack Amendment. Truckload Agreement, § 6. Morgan Foods has

19

clearly pled that such assumption of liability is triggered here given that it has not been compensated for any of its losses by MAFL's Drivers.

Because the carrier-status inquiry is fact intensive and requires discovery, Count V, sufficiently alleges in the alternative that MAFL was operating as a carrier for any (or all) of the Shipments.

### E. The Complaint States a Claim for Conversion.

As discussed above, in contrast to *Rowe*, state conversion claims could "not be more general or industry-neutral" as they are "neither aimed at, nor would its continued enforcement have any conceivable impact upon, interstate trucking commerce" with any relationship between a "common law prohibition on conversion and the prices, routes, or services of motor carriers is consequently too 'tenuous, remote, or peripheral' to require preemption." *Id.* at 877. The same holds true under North Carolina law, which requires only "(1) the unauthorized assumption and exercise of the right of ownership; (2) over the goods or personal property; (3) of another; (4) to the exclusion of the rights of the true owner" *Estate of Graham v. Morrison*, 168 N.C. App. 368, 371 (2005). Neither North Carolina common law nor Morgan Foods' claims target carriers or interstate commerce; they instead, focuses on industry-neutral compensation for Morgan Foods' damages. Accordingly, at the motion to dismiss stage, finding Morgan Foods' conversion claim to be preempted by the FAAAA is premature. Similarly, as discussed above, the economic loss rule does not bar recovery.

### F. The Complaint States a Claim for Unfair and Deceptive Trade Practices Under N.C. Gen. Stat. § 75-1.1 et seq.

North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). A prima facie claim requires allegations of "(1) an unfair or deceptive act or practice, (2) in or affecting

20

commerce, and (3) which proximately caused actual injury." *Dalton v. Camp*, 548 S.E.2d 704, 711 (2001). Conduct is "unfair" if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gray v. N.C. Ins. Underwriting Ass'n,* 529 S.E.2d 676, 681 (2000). A practice is "deceptive" if it has the capacity or tendency to deceive. *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 600 S.E.2d 492, 500 (2004).

Although a "mere breach of contract" is not itself a UDTPA violation, a breach accompanied by "substantial aggravating circumstances" is actionable. *Dalton*, 548 S.E.2d 704, 711-12. "Examples of such aggravating and egregious behavior include: (1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement." *Foodbuy, LLC v. Gregory Packaging, Inc*., 987 F.3d 102, 121 (4th Cir. 2021). That is what Morgan Foods has alleged here.

### i. MAFL's Egregious Misconduct "In or Affecting Commerce" Proximately Caused Morgan Foods' Injury.

#### 1. The Scheme Described in the Complaint Goes Well Beyond a Mere Contract Dispute and Constitutes Substantial Aggravating Circumstances.

MAFL characterizes this case as a simple failure to deliver goods or a run-of-the-mill performance dispute – effectively ignoring swaths of the Complaint containing allegations detailing the theft scheme involving MAFL and its hand-picked Drivers; the mid-route diversions; theft of product; disposal of unaltered PODs; alteration of those PODs; and repeated concealment from Morgan Foods *after* the shorted deliveries were made. (*See generally* DE #1-1, including ¶¶ 23-28, 117.) That conduct is not a mere failure of performance, and MAFL's suggestion that the claims here are most appropriately addressed by asking whether MAFL fulfilled its contractual obligations is misaligned with the well plead allegations. This entirely ignores MAFL's deliberate deception that offends established public policy and is "immoral, unethical, oppressive, [and]

21

unscrupulous." *Gray*, 529 S.E.2d at 681. It is also conduct that without a doubt had the tendency and capacity to deceive – as providing altered PODs is quintessential deception. *RD & J Props*., 165 N.C. App. at 748. The facts alleged in the Complaint include an organized, repeated course of deception tied to shipment documentation and post-notice obstruction and refusal to cooperate or provide timely information. (DE #1-1 ¶¶ 19, 23-24, 26-29, 37, 41-55.) Those allegations readily satisfy the "aggravating circumstances" requirement and distinguish this matter from the routine-contract cases MAFL relies upon. *See Dalton*, 548 S.E.2d at 711-12.

### 2. *MAFL Admits its Conduct was in or Affecting Commerce.*

MAFL also suggests the dispute is internal to Truckload Agreement, and therefore outside the scope of § 75-1.1. But courts have consistently construed the statute to "establish an effective private cause of action for aggrieved consumers in this State" and "to provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public." *Marshall*, 302 N.C. at 543. The Complaint alleges conduct undertaken in the marketplace: MAFL's selection and management of carriers; control over delivery parameters, pricing, and documentation; and representations to Morgan Foods and TI through altered PODs concerning delivered quantities. (DE #1-1 ¶¶ 15, 28, 29, 58-60) Those are clearly business activities "in or affecting commerce" within the meaning of § 75-1.1. *See Gray*, 529 S.E.2d at 681; *Marshall*, 302 N.C. at 548-50.

### 3. *Proximate Cause and Actual Injury are Sufficiently Plead.*

The Complaint alleges a direct causal chain: deceptive shipment handling and altered documentation that concealed product thefts after the delivery was made. Morgan Foods relied on those altered representations in reconciling deliveries and incurred substantial losses including the value of stolen product, fines, and other harms. (DE #1-1 ¶¶ 26-35, 38, 75, 86). That is sufficient at the pleading stage. *See Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226-29 (2013); *see*

22

*also Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104, 109 (4th Cir. 2016).

### 4. *MAFL's Post-Notice Conduct Further Supports Unfairness and Deception.*

North Carolina courts consider post-breach and post-notice conduct when assessing unfairness and deception, particularly where the defendant engages in concealment or obstruction that compounds the underlying misconduct. In *Garlock v. Henson*, the court held that a breach of contract, when accompanied by aggravating circumstances, could support a claim under N.C. Gen. Stat. § 75-1.1. 112 N.C. App. 243, 246, 435 S.E.2d 114, 116 (1993). The court found that the defendant's post-breach conduct, including forging a bill of sale and repeatedly denying a sale it knew had occurred, constituted substantial aggravating circumstances, supporting the trial court's conclusion that the defendant violated N.C. Gen. Stat. § 75-1.1. *Id.*

The Complaint's allegations of refusal to review or investigate claims, refusal to cooperate, failure to timely provide requested information reinforce that MAFL's conduct was unfair and deceptive in both execution and the cover-up. (DE #1-1 ¶¶ 39-55.)

### 5. *Morgan Foods' UDTPA Claim is not Barred by the FAAAA or the Economic Loss Rule*

Lastly, as discussed above, the FAAAA's preemption provision is more narrowly tailored than MAFL suggests, and MAFL offers no further support for its stance other than its plain statement that the FAAAA broadly preempts state law claims. Defendant's blanket statement that the FAAAA preempts all of Morgan Foods' state law claims alone is wholly insufficient to warrant dismissal at this stage.

### ii. The UDTPA Claim Survives as a Matter of Law.

MAFL's motion invites the Court to recharacterize detailed allegations of an affirmative scheme and repeated deception as a mere failure to perform under a logistics contract. North

Carolina law does not require the Court to ignore well plead facts. Taking the allegations as true and drawing reasonable inferences in Morgan Foods' favor as is required at this stage of the case, the Complaint plausibly alleges unfair and deceptive acts and practices in or affecting commerce that proximately caused injury. (DE #1-1 ¶¶ 122-126) That is more than sufficient to defeat a Rule 12 motion to dismiss. *See Dalton*, 353 N.C. at 656-57, 548 S.E.2d at 711-12; *Champion Pro*, 845 F.3d at 109; *Mountain Island Day Cmty. Charter Sch. v. Inspire Performing Arts Co., LLC*, No. 24-1893, 2025 U.S. App. LEXIS 22528 (4th Cir. Sept. 2, 2025)(unpublished). For all these reasons, MAFL's motion to dismiss should be denied.

### G. *Morgan Foods Properly Plead a Claim for Punitive Damages Under Chapter 1D.*

#### i. Legal Standard.

Punitive damages in North Carolina are governed by N.C. Gen. Stat. § 1D-15, which requires proof of at least one statutory aggravating factor such as fraud, malice, or willful or wanton conduct by clear and convincing evidence. *See Scarborough v. Dillard's, Inc*., 363 N.C. 715 (2009). MAFL's motion mischaracterizes both the governing punitive-damages standard and what Morgan Foods has plead. At the Rule 12(b)(6) stage, the question is not whether Plaintiff has proven these elements, but whether the Complaint plausibly alleges them. Morgan Foods' allegations readily clear that bar, including specific, repeated conduct that plausibly constitutes fraud and willful and wanton conduct, and allegations of corporate participation/condonation, which defeat MAFL's argument that punitive damages are impermissibly vicarious. (DE #1-1 ¶¶ 122-124.)

#### ii. The Complaint Plausibly Pleads Aggravating Factors Linked to Plaintiff's Injury.

MAFL asserts Morgan Foods has not alleged an aggravating factor, but the Complaint expressly pleads that "MAFL engaged in fraudulent and willful and wanton conduct, individually

24

and by and through its agents, representatives, and employees," and then itemizes the categories of that conduct, including failures to ensure safe and proper transport; failures in hiring, training, and supervision; post-discovery concealment; and aiding and abetting theft and concealment. (DE #1-1 ¶ 123.) Those are direct allegations of statutory aggravating factors under Chapter 1D, tied to Morgan Foods' economic losses. (*Id.* at ¶¶ 128-130.)

Critically, the Complaint pleads concrete facts supporting fraud and willful and wanton conduct, not mere labels. Among other things, Morgan Foods alleges that the Drivers altered PODs to erase shortages which "MAFL then provided the altered POD to Morgan Foods," thereby delaying discovery of the theft scheme; that this post-delivery concealment process was "repeated over and over again" across over one hundred Shipments; and that MAFL refused to review any of Mogan Foods' claims, conduct any investigations, and refused to cooperate with Morgan Foods' investigation. (*Id.* at ¶¶ 26-36, 54-55.) Taken as true, those facts plausibly allege intentional deception or, at minimum, a conscious and reckless disregard of Morgan Foods' rights.

The pleaded post-notice conduct independently supports a plausible inference of willful and wanton disregard. The Complaint alleges MAFL initially remained silent after receipt of Morgan Foods' Demand Letters, failed to provide requested information, and seemingly failed to investigate the Drivers it knew had a history of stealing product. (*Id.* at ¶¶ 49-54.) A fact finder could reasonably view such allegations as egregious indifference to known, serious risks and harms, more than sufficient at the pleading stage.

## VI. Plaintiff's Claims are Not Precluded, or Even Covered, by the Ten (10) Day Notice Provision of the Truckload Agreement.

Although MAFL does not move to dismiss Count I, it alludes to Section 6 of the Truckload Agreement which states that "[c]laims based on a concealed loss or damage must be reported . . . within ten (10) days of the date of delivery." While its Motion ignores key facts underlying Morgan

25

Foods' ability to identify the shortages, it also overlooks that MAFL admitted it was already on notice of issues regarding these carriers, yet, failed to alert Morgan Foods. (DE #1-1 ¶¶ 51-52, Ex. 142.) MAFL instead feigns ignorance, despite, by MAFL's own communications, knowing months before Morgan Foods that its Drivers were, among other things, "breaking and changing seals;" manipulating and consolidating loads; and removing OSD details from BOLs – the exact behavior that resulted in Morgan Foods' losses. (*Id.*) Additionally, that four of the five carriers used to ship Morgan Foods' product had issues and were placed on a Do Not Use list within a year casts a significant shadow over MAFL's due diligence and suggests it ignored the repeated red flags surrounding its Drivers, to Morgan Foods' detriment.

Even ignoring all of this, MAFL nevertheless misstates Morgan Foods' Complaint. Morgan Foods does not allege – now or at any point – that the losses were concealed **at delivery**. In fact, it has expressly pled otherwise, stating "that the loss was clear and readily reported to MAFL's Drivers (who obviously were already well aware of the 'loss')." (DE #1-1 ¶ 29.) Concealed loss claims would arise when Morgan Foods' product is delivered in apparently good condition, if *no* shortages were noted on the BOL, and if they could only be discovered after delivery. This is not the case here. Morgan Foods has alleged that at the time of delivery the shortage was immediately apparent to Morgan Foods' customer and was promptly reflected as such on the POD. (*See generally* DE #1-1, including ¶¶ 26-30.) Accordingly, any so-called concealment that MAFL could seek to assert would have occurred *after* delivery and would have been done by MAFL and/or its Drivers. Such post-delivery conduct is outside the concealable loss provision. Therefore, Morgan Foods has adequately pled that its recovery is not time barred.

26

**<u>CONCLUSION</u>**

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss. However, if the Court nevertheless concludes that Morgan Foods has not pled any of the causes of action with sufficient specificity, Plaintiff requests leave to amend under Rule 15(a), not dismissal with prejudice, to provide greater specificity to its claims. Consistent with Rule 15(a)'s liberal standard, courts routinely permit amendment – particularly at the pleadings stage so that claims may be decided on the merits.

Dated this 16th day of March, 2026.

TEAGUE, CAMPBELL, DENNIS & GORHAM, L.L.P.

BY: */s/ J. Matthew Little*
J. Matthew Little, NC State Bar No. 20032
Teague Campbell Dennis & Gorham, LLP
P.O. Box 19207
Raleigh, NC 2619-9207
mlittle@teaguecampbell.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, a copy of *Morgan Foods' Memorandum in Opposition to Defendant's Motion to Dismiss* was served on counsel of record via the Court's PACER system.

TEAGUE, CAMPBELL, DENNIS & GORHAM, L.L.P.

*/s/ J. Matthew Little*
J. Matthew Little

28